Brian S. King, #4610
Brent J. Newton, #6950
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DONNA S., MICHAEL S., and S. S., <br><br> Plaintiffs, <br><br> vs. <br><br> BLUECROSS BLUESHIELD of ILLINOIS, and the BAKER TILLY VIRCHOW KRAUSE, LLP HEALTH CARE PLAN, <br><br> Defendants. | COMPLAINT <br><br> Case Number 2:19-cv-00458 HCN |

Plaintiffs Donna S. ("Donna"), Michael S. ("Michael"), and S. S. ("S."), through their undersigned counsel, complain and allege against Defendants BlueCross BlueShield of Illinois ("BCBSIL") and the Baker Tilly Virchow Krause, LLP Health Care Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Donna, Michael, and S. are natural persons residing in Ozaukee County, Wisconsin. Donna and Michael are S.'s parents.

2. BCBSIL is an independent licensee of the BlueCross and BlueShield network of providers, and was the third party claims administrator for the Plan during the treatment at issue in this case.

1

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Donna was a participant in the Plan and S. was a beneficiary of the Plan at all relevant times. Donna and S. continue to be participants and beneficiaries of the Plan.

4. S. received medical care and treatment at Wingate Wilderness Therapy ("Wingate") from April 25, 2015, to July 13, 2015, and Sedona Sky Academy ("Sedona") from July 14, 2015, to July 24, 2016. These are facilities which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. Wingate is located in Utah and Sedona is located in Arizona.

5. BCBSIL denied claims for payment of S.'s medical expenses in connection with her treatment at Wingate and Sedona. This lawsuit is brought to obtain the Court's order requiring the Plan to reimburse Donna and Michael for the medical expenses they have incurred and paid for S.'s treatment.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because BCBSIL does business in Utah, and a significant portion of the treatment at issue took place in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for

appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### S.'s Developmental History and Medical Background

9. S. had difficulty with transitions as well as things that were unfamiliar such as new places or new situations. She didn't like tags on her clothing and often broke down into tantrums. S. had high levels of separation anxiety and would become hysterical when Michael and Donna tried to leave her with a babysitter or with her kindergarten teacher. On one occasion when Donna and Michael were going to go to a Christmas party, S. cut up Donna's jacket with scissors in an attempt to keep her from leaving.

10. S. was very intelligent and tended to do well academically. She was placed in the gifted program and had very high standardized testing scores. Despite her intelligence, S. struggled to act maturely. S. was disruptive in her classes and stopped attending extracurricular activities once she had reached the seventh grade. She quit band because the teacher made her cry and refused to attend the school concert because her parents wouldn't be there.

11. S.'s best friend moved out of town at the end of the seventh grade, and shortly after the start of eighth grade, S. was kicked out of her peer group. One girl in the group decided to ostracize S. and the rest of her friends followed suit. S. started having frequent panic attacks and would complain to Donna about not being able to breathe. S. started seeing a

therapist and confessed to Donna that she was having difficulty communicating in social settings even though she had previously not had much difficulty with making friends.

12. In the summer following eighth grade, S. attempted to attend a three week long transitions to high school camp. She only lasted five days before she came home due to extreme anxiety. S. had no idea how to control her anxiety and so she lied to the camp counselor and said she had to leave because she was anorexic.

13. S. made a new friend around this time and they started experimenting with alcohol and marijuana. S. started hanging around with boys and her grades began to suffer. She often stayed out late, and she often would not come home until past midnight if she even came home at all. On one of these occasions, Donna called the police and they treated S. as a runaway. S. was spending quite a bit of time with one boy in particular who was abusive and controlling. They would stay out late and use drugs together.

14. S. claimed that she had difficulty concentrating in school and was diagnosed with anxiety and Attention Deficit Disorder ("ADD"). S. began abusing her ADD medications and was arrested in October of 2014 for disorderly conduct. She was arrested again in April of 2015 after she hit Donna and knocked her glasses off. Donna got a restraining order against the boy that S. was always hanging around and using drugs with and Donna told S. that she would attempt to charge this boy with statutory rape. S. continued to meet with this boy in spite of her mother's objections.

15. S. became increasingly addicted to electronic devices and would stay up all night using them. When Donna would attempt to intervene such as by shutting off the internet in the middle of the night, S. would become physical and hysterical. S. continued to lie to her parents about her whereabouts as she snuck off or skipped school with the boy.

16. In February of 2015, S. and Donna began meeting with a social worker. The social worker warned S. that the boy she was seeing was controlling and manipulative and was causing her to do things that she would not otherwise do. S. continued to see this boy and he stole medication from the house when Donna and Michael weren't home. S. became even more addicted to electronic devices and was also regularly skipping classes.

17. Donna and Michael attempted to hospitalize S. involuntarily, but because she was over the age of fourteen and refused to consent, they were unable to do so under state law. S. did consent to attend a less intensive treatment program and was also placed on an individualized education plan around this time.

18. S. made up a story about breaking the boy's watch and needing $150 to pay him back. When Donna and Michael refused, she became very upset and attempted to jump out of Michael's car in the middle of the expressway. Michael then drove her to the police station. Because Michael and Donna had refused to give her money, S. gave the boy her MacBook computer which he then sold or traded for drugs.

19. In March of 2015, S. requested that Donna take her to the doctor be tested for chlamydia. She claimed that she may have gotten it by sharing a bottle of Gatorade with a girl. Wisconsin state law prohibited Donna from receiving the results of this test. In April of 2015, Donna and Michael found the boy in their basement using drugs with S. and another underage girl, they kicked the boy out and drove the other girl home.

20. It was discovered that the boy had stolen Michael's wedding ring and attempted to pawn it. Other jewelry was discovered to be missing around the house as well. S. continued to fail drug tests, her school performance suffered, and her behaviors did not improve

despite numerous attempts at treatment at an outpatient level of care. Michael and Donna hired an educational consultant who recommended that S. be treated at Wingate.

### Wingate

21. S. was admitted to Wingate on April 25, 2015.

22. In an Explanation of Benefits ("EOB") form dated December 7, 2015, BCBSIL denied payment for S.'s treatment at Wingate under denial code 1 :"This service is excluded under your Health Care Plan. Please refer to your benefit booklet for specific coverage information and exclusions under your contract."

23. On June 3, 2016, Donna submitted a level one appeal of the denial of payment for S.'s treatment at Wingate. Donna took issue with the fact that BCBSIL did not identify which plan exclusion it relied upon in order to come to the decision to deny care. She stated that the Plan did contain an exclusion for "Residential Treatment Centers, unless in a participating provider hospital," but she claimed that this was contradicted in the Schedule of Benefits section of the Plan where it stated that inpatient residential treatment and other mental health and substance abuse treatment from a non-participating provider was a covered benefit under the terms of the Plan.

24. She contended that the exclusion was further contradicted in the "Special Conditions and Payments" section of the Plan booklet where it discussed that residential treatment and other intermediate levels of care such as substance abuse treatment were covered so long as they were, "rendered by a Behavioral Health Practitioner working within the scope of their license."

25. She wrote that Wingate met the Plan's definitions of a "Behavioral Health Practitioner," a "Professional Provider", a "Provider", as well as a "Residential Treatment Center." She

    contended that Wingate was a licensed facility by the State of Utah and that it provided clinically appropriate short-term treatment for S. that was in accordance with generally accepted standards of medical practice for mental health and substance abuse treatment.

26. She contended that BCBSIL's denial was in violation of state and federal parity laws. She wrote that coverage for S.'s treatment was mandated by the State of Illinois as well as through MHPAEA. She asked that in the event that BCBSIL upheld the denial that it disclose why the services S. received at Wingate were not mandated under MHPAEA.

27. After BCBSIL failed to respond to the level one appeal, S. submitted a complaint to the Plan Administrator on March 14, 2017. Donna wrote that while BCBSIL had stated that S.'s treatment was denied, she had contested this in her appeal. She reiterated that the treatment provided at Wingate was a covered service, was not excluded under the terms of the Plan, and was required to be covered under state and federal parity laws.

28. Donna noted that in the denial EOB it was stated that BCBSIL generally responded to an appeal within 60 days. She then quoted the terms of the Plan which stated that BCBSIL "shall render a determination of the appeal within 30 days after the appeal has been received by the Claim Administrator." She pointed out that BCBSIL had failed to respond in a timely manner under either standard.

29. She wrote that after the sixty days had passed, she contacted BCBSIL[1] to ascertain the status of her appeal. She was notified that BCBSIL had received the appeal on June 8, 2016, but it had not yet processed the appeal. She documented multiple phone calls over the course of several months where she was told that her appeal had not yet been processed, but a response was expected soon.

---

[1] Donna's contacts with BCBSIL were done through a representative.

30. Donna stated that she finally received a response from BCBSIL on January 27, 2017, some 234 days after BCBSIL had acknowledged receipt of the appeal, she questioned why it had taken BCBSIL so long to respond, and noted that when BCBSIL finally did respond, the letters were addressed to Wingate and not to her.

31. She stated that she received two letters, both dated January 27, 2017, one informing her that her appeal had been received on June 8, 2016, and would be reviewed within 60 days and the other upholding the denial of payment. BCBSIL wrote that the denial was upheld based on the terms of the policy, specifically:

> The claims in question … for the Revenue code 1002 (residential treatment-chemical dependency) has processed correctly according to the BCBSIL Health Insurance Policy. The claims in question were billed by a wilderness program which under the definition section states is not considered a residential treatment center.

The letter informed Donna that her internal appeals were exhausted.

32. Donna wrote that BCBSIL had not appropriately considered or addressed the arguments that she had raised in her appeal, including her argument that BCBSIL was not in compliance with MHPAEA or Illinois state parity law, in spite of her explicit request that BCBSIL address this in its response, and the fact that she was entitled to this information under ERISA. She conceded that while Wingate was not a residential treatment center, it was licensed by the State of Utah and was a covered service under the terms of the Plan.

33. She stated that because Wingate was not a residential treatment center, it should not be required to meet the definition of a residential treatment center. She wrote that BCBSIL had approved and paid for intermediate level outdoor behavioral health programs like Wingate for other clients in the past. She argued that S.'s treatment was medically necessary and should have been approved by BCBSIL.

34. Donna did not receive any response to her complaint.

### Sedona

35. S. was admitted to Sedona on July 14, 2015, immediately following her treatment at Wingate. S.'s discharge summary from Wingate stated in part, "It is recommended that [S.] transition directly to a Residential Treatment Center with a strong peer milieu, individual and group therapy for a minimum of 10 to 12 months."

36. In an unsigned letter dated July 17, 2015, BCBSIL denied payment for S.'s treatment at Sedona. The reviewer gave the following justification for the denial:

> …Based on the clinical information provided, you did not meet ASAM MEDICAL NECESSITY CRITERIA for admission to the SUBSTANCE ABUSE RESIDENTIAL TREATMENT (RTC) level of care for the following reasons: There is no reported history of withdrawal seizures or delirium tremens. The identified self-care concerns would not keep you from participating in treatment at a lower level of care. There was no report of medical instability. You have a sober support system. There was no report of psychosis or mania. You could be treated safely and effectively in a less restrictive level of care. From the clinical evidence, you can be safely treated in a less restrictive setting such as SUBSTANCE ABUSE INTENSIVE OUTPATIENT PROGRAM (IOP). No medically necessary days were authorized. …

37. On January 11, 2016, Donna submitted a level one appeal of the denial of payment for S.'s treatment at Sedona. Donna wrote that according to its letter, BCBSIL had evaluated the medical necessity criteria of S.'s treatment using only its ASAM substance abuse criteria. Donna noted that S. had a dual diagnosis of mental health and substance abuse issues, but she contended that S.'s mental health conditions were the primary reason that she received treatment. Donna wrote that given this information, it was inappropriate to evaluate S.'s treatment using substance abuse criteria only.

38. Donna wrote that S. had attempted treatment with four separate therapists before she was enrolled in residential treatment, without significant effect. One of these therapists, Carolyn Becker, Psy. D. wrote in a letter dated September 9, 2015:

   …Based on [S.]'s presentation in my appointments with her, reports by parents regarding behavior and mood, review of inpatient and PHP chart, and collaboration with county social workers, it is my recommendation that she be admitted to a six month or more, treatment program to address her complicated mental health needs. …

39. On June 9, 2016, Donna requested that the denial of S.'s claims be evaluated by an external review agency. Donna wrote that BCBSIL had mishandled her claims and her appeal and had not processed them properly.

40. She stated that after she received no response to her appeal, she contacted BCBSIL on February 18, 2016, to ascertain the status of her appeal and was told that the denial had been overturned. She wrote that this was confirmed in another contact on March 22, 2016. She then attempted to contact BCBSIL again on March 30, 2016, but BCBSIL refused to provide her with any information.

41. On May 4, 2016, she contacted BCBSIL again, and was told that BCBSIL had lost the appeal and had closed the claim. Donna submitted a second copy of the appeal and was told it would be sent to the correct department. In another call on May 27, 2016, Donna discovered that BCBSIL had done nothing with the appeal since receipt.

42. BCBSIL eventually contacted Donna following her external review request in a letter dated June 28, 2016. This letter appears to be a response to Donna's January 11, 2016, level one appeal that BCBSIL lost and that she resubmitted on May 4, 2016. The letter maintained the denial and gave the following summary for the decision:

   …You were not reported as being an imminent danger to self or others. There was no evidence of inability to adequately care for yourself. There was no report of

    medical instability. From the clinical evidence, you can be safely treated in a less restrictive setting such as Mental Health Outpatient (OP). No medically necessary days were authorized. …

The letter informed Donna that she had the right to submit an external review request even though she had already done so weeks earlier on June 9, 2016.

43. The external review agency responded to Donna's request in a letter dated August 9, 2016. This document from the external reviewer makes no reference to the arguments Donna had raised in her prior appeals, including her argument that BCBSIL had evaluated S.'s care using inappropriate criteria, and that it had not processed her appeal properly.

44. The external review document notes that the external reviewer evaluated S.'s non-acute residential treatment using the Milliman Care Guidelines acute level residential care criteria. As these criteria were meant for individuals suffering from acute symptomology, they include such requirements as presenting an imminent danger to self or others, having a life-threatening inability to receive adequate care, and experiencing severe psychiatric symptoms such as hallucinations or delusions. The reviewer opined that while S. did meet some of these acute level criteria, she did not meet enough of them to approve her care.

45. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

46. The denial of benefits for S.'s treatment was a breach of contract and caused Donna and Michael to incur medical expenses that should have been paid by the Plan in an amount totaling over $379,000.

    //

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

47. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as BCBSIL, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

48. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

49. BCBSIL's failure to respond to Donna's complaint, coupled with its failure to respond to respond to Donna's January 11, 2016, appeal within the timeframe set forth by the terms of the Plan is a violation of ERISA's claims processing regualtions.

50. BCBSIL and the agents of the Plan breached their fiduciary duties to S. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in S.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of S.'s claims.

51. The actions of BCBSIL and the Plan in failing to provide coverage for S.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

//

//

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

52. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

53. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

54. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

55. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

56. Specifically, the Plan's medical necessity criteria for intermediate level mental health treatment benefits are more stringent or restrictive than the medical necessity criteria applied to intermediate level medical or surgical benefits.

57. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for S.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation

13

facilities. For none of these types of treatment does BCBSIL exclude or restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner BCBSIL excluded coverage of treatment for S. at Wingate and Sedona.

58. The actions of BCBSIL and the Plan requiring that S. satisfy acute care medical necessity criteria in order to obtain coverage for residential treatment violates MHPAEA because the Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

59. The actions of BCBSIL and the Plan requiring conditions for coverage that do not align with medically necessary standards of care for treatment of mental health and substance use disorders and in requiring accreditation above and beyond the licensing requirements for state law violate MHPAEA because the Plan does not impose similar restrictions and coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

60. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and BCBSIL, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

61. When BCBSIL and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms

of the Plan based on generally accepted standards of medical practice. BCBSIL and the Plan evaluated S.'s mental health claims under a more restrictive standard than generally accepted standards of medical practice. This process resulted in a disparity where equivalent mental health benefits were denied when the analogous levels of medical or surgical benefits would have been paid.

62. The violations of MHPAEA by BCBSIL and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

    (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

    (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan and BCBSIL insured plans as a result of the Defendants' violations of MHPAEA;

    (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

    (g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

63. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for S.'s medically necessary treatment at Wingate and Sedona under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 1st day of July 2019.

By    s/ Brian S. King
       Brian S. King
       Attorney for Plaintiffs

County of Plaintiffs' Residence:
Ozaukee County, Wisconsin.